UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JABRIE BENNETT,<br><br>        Plaintiff,<br><br>       v.<br><br>JEFF LYNCH,<br><br>        Defendant. | Case No. 20-cv-05675-WHO<br><br>**ORDER DENYING WRIT OF HABEAS**<br>Re: Dkt. No. 1 |

Petitioner Jabrie Bennett seeks federal habeas relief from his state convictions for second-degree murder and other crimes on the grounds that the prosecutor violated the Equal Protection Clause by striking a potential juror because he was Black, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Bennett's claim lacks merit and his petition is DENIED.

**BACKGROUND**

In 2014, an Alameda County jury convicted Bennett of second-degree murder, attempted murder, and assault with a semiautomatic weapon, along with firearm enhancements. Pet. [Dkt. No. 1] 1:15-24. He was sentenced to 72 years to life in state prison. *Id*. at 2:7-8. The convictions stemmed from two shootings in January 2013: one in Oakland, California, that wounded a high school student and another two days later in San Leandro, California, that killed a 50-year-old man waiting for a bus. Answer [Dkt. No. 13] 2:1-3:21; *see also* Answer, Ex. H ("State Appellate Op.") at 2-4. Because Bennett's appeal focuses on a *Batson* challenge made at his trial, rather than the facts underlying his convictions, I focus my attention on the procedural history.

During jury selection, the prosecutor used peremptory challenges to strike four Black

jurors. Pet. at 7:22-26 (citing Reporter's Transcript ("RT") V at 827)).[1] One Black juror was empaneled and another was an alternate. *Id.* at 7:24-25 (citing RT V at 827, 853). Bennett's counsel made a *Batson* motion to each of the four peremptory challenges. *Id.* at 7:26-27 (citing ART II at 313, 337, 402; ART III at 462). Only one, involving prospective juror Domanique J., is at issue in the present petition. *See* Pet. at 8:7-20.

The California Court of Appeal described the *Batson* challenge involving Domanique J. as follows:

> On his jury questionnaire, Domanique J.—a 22-year-old Black man who had recently moved to California—indicated that he held a bachelor of fine arts degree in dance and had attended a high school for the performing arts in New York City. Domanique J.'s questionnaire also disclosed that he had an aunt who had been arrested for "drug trafficking"; that he had visited her in jail; and that he, himself, had been arrested for public intoxication. Domanique J. was uninterested in reading material or video entertainment involving: "Criminal, court, Law & Order, News." And he stated that: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked."
>
> During voir dire, the prosecutor asked Domanique J. more about his lack of interest in criminal justice-related entertainment, which elicited the following response: "I just, I don't find crime or anything dealing with the court interesting. I mean, if it was up to me, I would rather just not be here." With respect to his arrest for public intoxication, Domanique J. elaborated: "At the time, like the arrest, I guess you would say I didn't feel like I was treated fairly, but I definitely got off very easy. So—." When asked about his aunt's arrest, Domanique J. stated that she was convicted of trafficking drugs (marijuana) and spent four or five years in jail; he was close to her; he "was living there at the time," although he did not go to court with her; he visited her in jail three times; and, when she was released earlier that year, he spoke with her about her case. The prosecutor challenged Domanique J. immediately after he was questioned.
>
> Later, when asked to explain his reasons for the challenge, the prosecutor highlighted the fact that Domanique J. questioned "whether the criminal justice system works for the most part." The

---

[1] Citations to "RT" and "ART" refer to the Reporter's Transcript and Augmented Reporter's Transcript, respectively, of Bennett's trial, and can be found at Docket No. 14 as Exhibits D and E. Citations to "CT" and "SCT" refer to the Clerk's Transcript and Supplemental Clerk's Transcript and are available as Exhibits A, B, and C. The roman numeral reflects the volume number.

2

>>prosecutor also noted that "at a time when he was living with his mother, she was arrested and charged and convicted of drug trafficking." The prosecutor felt that "he was living with her at the time, and then the fact that he has visited her in prison, certainly suggests someone who might be prone to sympathy at the prospect of somebody going to prison for a crime."

State Appellate Op. at 17-18. The trial court concluded that Domanique J., like the other challenged jurors, were challenged for race-neutral reasons and denied Bennett's *Batson* motions. Pet. at 8:2-6 (citing RT V at 881).

Bennett appealed to the California Court of Appeal, arguing in part that the prosecutor improperly used three of his peremptory challenges to excuse potential jurors, including Domanique J., based on their race. State Appellate Op. at 2. The Court of Appeal determined that there was no error and upheld Bennett's conviction. *See id*. With respect to the *Batson* challenge now at issue, the court found:

> In ruling on the motions before it, the trial court made certain findings applicable to all of the jurors in question. Preliminarily, it found that appellants had made out a prima facie case that the prosecutor had improperly exercised peremptory challenges based on race. Next, the trial judge detailed his own experiences as a lawyer and bench officer in the community, describing a career in Alameda County which included being a superior court judge for almost five years; a municipal court judge for over 27 years; and, before that, a lawyer with a criminal practice. Finally, with respect to numbers, one Black prospective juror was successfully challenged for cause by the defense, four Black jurors were peremptorily challenged by the prosecutor, one Black juror (Juror No. 2) was seated on the jury, and another Black juror was seated as an alternate. The trial court noted that the prosecutor had ample opportunity to challenge both Juror No. 2 and the Black alternate juror and declined to do so, a factor he found "powerful evidence" supporting the credibility of the prosecutor's proffered reasons for excusing jurors.
>
> \*   \*   \*
>
> [T]he trial court found that the prosecutor's challenge based on Domanique J.'s stated belief that the criminal justice system was flawed was legitimate and race-neutral. As for the prosecutor's other articulated reason for challenging Domanique J., the trial court opined, correctly, that "caselaw has repeatedly held that negative experience by the juror or a close relative of the juror [with the criminal justice system], that is a bona fide and genuine and race neutral reason to excuse the juror." (*See, e.g., People v. Cruz* (2008)

3

44 Cal.4th 636, 655, fn.3, [citing cases]; *Wheeler*, 22 Cal.3d at p. 277, fn. 18 [stating that a "personal experience" with conviction and incarceration "suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution"].) The court noted that Domanique J. "indicated that his mother was arrested for drug trafficking, that he visited her in prison. He was living with her when she was convicted of this crime." Thereafter, the court went even further than the prosecutor on this point, stressing Domanique J.'s own experience with the criminal justice system: "[H]e, himself, had a contact with the criminal justice system, that he had a negative experience with that. He felt that he was not treated fairly, although he seems to admit and acknowledge that what he was arrested for was public intoxication, and he served a very lenient sentence, even by his own standards, which he admitted. But, nevertheless, he harbors the feeling which he expressed here in court, that his experience was a negative one. He doesn't feel that he was fairly treated by the criminal justice system."

On appeal, appellants make much of the fact that both the court and the prosecutor got certain facts wrong during discussion of the *Batson/Wheeler* motion involving Domanique J. Specifically, appellants point out that was Domanique J.'s aunt, not his mother, who was arrested; claim that he was not living with his aunt at the time; and stress that, contrary to the prosecutor's justification, Domanique stated that the criminal justice system does "work for the most part." However, "[w]hile a prosecutor's credibility may be questioned if the prosecutor 'mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs,' a prosecutor's 'mistake in good faith, such as an innocent transposition of juror information,' does not support a finding that the prosecutor is not credible." (*Sifuentes v. Brazelton* (9th Cir. 2016) 815 F.3d 490, 512; *see also People v. O'Malley* (2016) 62 Cal.4th 944, 980 ["prosecutor's mistaken reference . . . alone does not establish that the prosecutor's stated reasons were pretexts for discrimination"]; *People v. Williams* (2013) 56 Cal.4th 630, 661 [no *Batson/Wheeler* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason]; *People v. Williams* (1997) 16 Cal.4th 153, 189 ["a genuine 'mistake' is a race-neutral reason"].)

Here, while misstatements were certainly made, we do not find them significant. As such, they do not supply a basis for finding the prosecutor not credible. For example, it is true that Domanique J. did not, as the prosecutor stated, question "whether the criminal justice system works for the most part." Rather, he said: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked." Thus, while he misspoke, the prosecutor was correct in his belief that Domanique J. felt that the system sometimes does not work. And, as stated above, the trial court found

4

this proffered justification (flawed criminal justice system) to be credible and race-neutral. Similarly, with respect to the incarcerated relative, it was clearly Domanique J.'s aunt rather than his mother. Moreover, when asked whether they were close, Domanique J. stated: "Yes. I was living there at the time, I didn't go [to] the court, but I was around her, the relatives when it was going on." While this was perhaps ambiguous as to whether the prospective juror lived in the same house or just in the same geographic area as his aunt, at bottom, the record supports that Domanique J. had a close relative; that he was around her while she went through the court process; that she was incarcerated for a significant period on drug trafficking charges; and that he visited her multiple times during her incarceration. The trial court found this a valid and race-neutral reason to challenge Domanique J. and we see no error in this regard, despite the minor misstatements that were made.

Finally, we reject again appellants' attempt to marshal comparable jurors, here arguably to show that they had experiences with incarceration similar to Domanique J., but were not challenged by the prosecutor. Juror No. 3's questionnaire disclosed that, 30 years ago, the juror had visited an inmate at Vacaville prison. The individual apparently was not a relative or close friend. Juror No. 12 indicated that "years ago" she picked up her brother at the Santa Rita Jail after he had been arrested on a domestic violence charge for which he was never prosecuted. And Juror No. 12 stated that he worked as a counselor at a correctional facility for six months during graduate school. Obviously, none of these experiences compares with visiting a close relative convicted of a serious crime on multiple occasions while she was incarcerated. Appellants also suggest the same comparable jurors on the issue of the fairness of the criminal justice system that they advanced in their challenge to Pierre M. But this attempt fails here for the same reason: None of those jurors had any other serious disqualifying issue, such as Domanique J.'s experiences regarding his aunt's incarceration. . . . Thus, they were not similarly situated.

In sum, the trial court here considered at length the prosecutor's reasons for challenging each of the three prospective jurors discussed above, concluded that all of the proffered reasons were valid and race-neutral, and expressly found the prosecutor credible and his justifications genuine. We see no *Batson/Wheeler* error on this record, and certainly no abuse of discretion.

*Id*. at 10, 18-21.[2]

---

[2] The appellate court's references to the "appellants" include Bennett's co-defendant, Andre Smith, whose conviction was also affirmed but is not at issue in this petition for habeas relief. *See* State Appellate Op. at 1-2.

5

In so deciding, the Court of Appeal rebuffed Bennett's argument that de novo review was warranted. *See id.* at 11 n.6. As it explained:

> In reaching this conclusion, we reject appellants' suggestion that de novo review is appropriate on this record because the trial court applied an improper legal standard in denying their *Batson/Wheeler* claims. Specifically, appellants argue that the trial court incorrectly relied on the fact that the prosecutor left one Black juror on the jury to find no evidence of racial discrimination in this case. It is true that the fact that the prosecutor "passed" or accepted a jury containing a Black juror is not the end of our inquiry. (*People v. Snow* (1987) 44 Cal.3d 216, 225 (*Snow*).) Such a rule "would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion." (*Ibid.*) However, our high court has repeatedly held that "[w]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider." (*People v. Turner* (1994) 8 Cal.4th 137, 168; *see also People v. Gutierrez* (2017) 2 Cal.5th 1150, 1170-1171; *People v. Blacksher* (2011) 52 Cal.4th 769, 802; *Lenix, supra*, 44 Cal.4th at p. 629; *People v. Cornwell* (2005) 37 Cal.4th 50, 70, disapproved on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Snow*, at p. 225.) That is exactly what the trial court did here. Among many other factors, it concluded that the retention of one Black juror and one Black alternate supported a finding that the prosecutor's race-neutral reasons for his peremptory challenges were credible. We see no legal error. However, even were we to conclude that the trial court improperly inflated the importance of this factor by finding it "powerful evidence" of the prosecutor's lack of discriminatory intent—and even were we to assume that this amounted to legal error sufficient to vitiate our otherwise deferential review of the trial court's *Batson/Wheeler* conclusions—we would reach the same result under a de novo standard of review.

*Id.* at 11 n.6.

On May 15, 2019, the California Supreme Court denied Bennett's petition for review. Pet. at 2:9-11. Having exhausted his remedies in state court, Bennett timely filed this petition for a writ of habeas corpus. *See* Dkt. No. 1.

## LEGAL STANDARD

### I.  AEDPA

A district court may consider a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition "shall not be granted with respect to any claim that was adjusted on the merits in state court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.* § 2254(d). "On federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (citation and quotations omitted).

The "standard of 'contrary to, or involving an unreasonable application of, clearly established federal law' is difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (same). A state court decision is "contrary to" clearly established law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. But the court may not grant relief just because it independently concludes that the state court "applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. The question is "whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

1    Under AEDPA, the reviewing court evaluates "the last reasoned state-court decision,"
2    which in this case is from the California Court of Appeal. *See Murray v. Schriro*, 745 F.3d 984,
3    996 (9th Cir. 2014) (citation omitted). The petitioner bears the burden of proof. *Cullen v.*
4    *Pinholster*, 563 U.S. 170, 181 (2011) (same).

**II.    BATSON**

The Fourteenth Amendment's Equal Protection Clause forbids prosecutors from using peremptory challenges to exclude potential jurors solely because of their race. *Batson*, 476 U.S. at 89. A *Batson* challenge has three steps. First, the defendant must establish a prima facie case that the challenge was based on race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id*. at 93-94. A pattern of excluding jurors of a particular race may raise a plausible inference of discrimination, even if the prosecutor has not attempted to remove all potential jurors of that race and a few remain on the jury. *See Paulino v. Castro*, 371 F.3d 1083, 1090-92 (9th Cir. 2004).

Next, if the requisite showing is made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror. *Batson*, 476 U.S. at 97. The explanation need not be persuasive, or even plausible, it need only be "a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 768-69 (1995) (finding that a prosecutor's explanation that he struck a black juror because he had "long, unkempt hair, a mustache and a beard" was race-neutral and satisfied *Batson*'s second step).

The trial court then moves to the third and final step: determining whether the defendant has shown purposeful discrimination based on race. *Batson*, 476 U.S. at 98. To do so, the court "must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools, including its own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (citation omitted).

**DISCUSSION**

**I.    STANDARD OF REVIEW**

As a threshold matter, the parties dispute which standard of review applies. Bennett argues that I should review his petition de novo because the trial court failed to follow clearly established

law by applying the wrong legal standard. Pet. at 10:18-11:26 (citing in part *Castellanos v. Small*, 766 F.3d 1137, 1146 (9th Cir. 2014) ("If the state court applies a legal standard that contradicts clearly established federal law, we review de novo the applicant's claims, applying the correct legal standard to determine whether the applicant is entitled to relief.")). He contends that the trial court erred when it considered the demographic of the jury—specifically, that it included one Black juror and one Black alternate—at the third stage of the *Batson* inquiry rather than the first, as indicated by the court's comment that the presence of a Black juror and a Black alternate was "powerful evidence" supporting the prosecutor's credibility. *Id*. at 11:6-13:24.

Bennett's argument slightly misses the mark. "Under AEDPA, when more than one state court has adjudicated the applicant's claim, [courts] must look to the last 'reasoned' decision" for review. *See Castellanos*, 766 F.3d at 1145 (citation omitted). Although Bennett agrees that the Court of Appeal's decision is the last reasoned decision, and contends that its "wholesale acceptance" of the trial court's consideration of the jury demographic was "off the mark" because it did not "distinguish at which *Batson* step it may be considered," he primarily argues that de novo review is appropriate because the *trial court* erred. *See* Pet. at 12:18-26, 13:19-24. In this instance, that does not determine whether de novo review should apply.

The state first contends that the court's findings at the third stage of the *Batson* review— whether the prosecutor's reasons for striking Domanique J. were credible—is a factual finding that should be reviewed under section 2254(e)(1) and presumed correct. *See* Answer at 12:3-13:2. However, it notes that the Ninth Circuit has held that federal habeas review of this question falls under section 2254(d)(2), resulting in a "doubly deferential" standard of review where "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence," it must be upheld. *See id*. at 12:22-3:2 (citing in part *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) (en banc); *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).

I need not decide which standard of review applies, as Bennett's petition fails under both.

## II.   DE NOVO REVIEW

Bennett focuses his appeal on the third stage of the *Batson* inquiry, arguing first that the

1  prosecutor's reasons for dismissing Domanique J.—his mother's conviction and his beliefs about
2  the criminal justice system—were not supported by the record and mischaracterized the
3  prospective juror's statements. *See* Pet. at 16:4-20:15. Bennett further contends that the
4  prosecutor's justification for dismissing Domanique J. because of his potential sympathy for
5  criminal defendants was not race-neutral, as the prosecutor failed to dismiss similarly situated
6  jurors. *Id*. at 20:16-21:9. Taken together, Bennett argues, this shows that the prosecutor's race-
7  neutral reasons for dismissing Domanique J. were not credible and instead "pretexts put forth to
8  cover up purposeful discrimination" in violation of the Equal Protection Clause. *See id*. at 8:7-20.

Courts have "drawn a fine distinction between a prosecutor's false statement that creates a new basis for a strike that otherwise would not exist and a prosecutor's inaccurate statement that does nothing to change the basis for the strike." *Jamerson v. Runnels*, 713 F.3d 1218, 1232 n.7 (9th Cir. 2013). When the prosecutor's reasons are unsupported by the record, such as when a prosecutor "mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs," the prosecutor's credibility is undermined. *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013); *Sifuentes v. Brazelton*, 825 F.3d 506, 516 (9th Cir. 2016). But a prosecutor's "mistake in good faith, such as an innocent transposition of juror information," does not undermine the prosecutor's credibility and establish purposeful discrimination. *Aleman*, 723 F.3d at 982; *see also Rice v. Collins*, 546 U.S. 333, 340 (2006).

The prosecutor proffered three reasons for striking Domanique J.: (1) because "at a time when he was living with his mother, she was arrested and charged and convicted of drug trafficking"; (2) because he visited her in prison and "might be prone to sympathy at the prospect of somebody going to prison for a crime"; and (3) because he "question[ed] whether the criminal justice system works for the most part." RT V 859.

### A. The Statements Regarding Domanique J.'s Mother

Bennett is correct that the prosecutor misstated Domanique J.'s testimony about his relative by stating that it was his mother who was convicted and incarcerated when he was living with her, rather than his aunt. Pet. at 16:21-24. The record shows that Domanique J. stated on his juror questionnaire that he "visited my aunt when she went to jail for drug trafficking." SCT III at

10

727. During voir dire, when asked about his aunt, Domanique J. further stated that she "spent about four or five years in jail," that he visited her in jail three times, and that he spoke to her about the case when she was released from jail earlier that year. ART III at 458. When asked if he was close to his aunt, Domanique J. replied: "Yes. I was living there at the time, I didn't go [to] the court, but I was around her, the relatives when it was going on." *Id*.

When explaining his strike to the court, the prosecutor stated that "at a time when [Domanique J.] was living with his mother, she was arrested and charged and convicted of drug trafficking." RT V at 859. The prosecutor further stated:

> Now, whether that raises the specter that he may have been aware of that or seen evidence of that or certainly have no reason to suspect that he participated in it, but that he was living with her at the time, and then the fact that he has visited her in prison, certainly suggests someone who might be prone to sympathy at the prospect of somebody going to prison for a crime.

*Id*.

It is clear from the record that the prosecutor erred in referring to Domanique J.'s mother instead of his aunt. Bennett argues that this was "no innocuous mistake." Pet. at 17:5-7. He contends that it is "more likely" that a person lives with his mother rather than his aunt, and that "a person's emotional attachment with their mother is usually greater than that with their aunt." *Id*. at 17:7-9. He argues that the prosecutor "took advantage of his misstatement of Domanique J's testimony to argue that both the physical proximity and familial bond between his mother and him disqualified Domanique J." *Id*. at 17:9-14. According to Bennett, the prosecutor also summoned a racially stereotyped image of "a mother sitting in the middle of her house packaging marijuana in front of her children"—"a fabricated story that had absolutely no basis in the record to justify his dismissal of Domanique J." *Id*. at 17:15-21. By accepting the prosecutor's justification, Bennett argues, the court incorrectly deemed it credible. *Id*. at 17:23-25.

According to the state, it did not matter whether the prosecutor mentioned Domanique J.'s mother or aunt, as "the thrust of the prosecutor's statement was that Domanique J. was close to a relative who was arrested and imprisoned for drug trafficking, that Domanique J. visited that relative multiple times in prison, and that this indicated that Domanique J. may be sympathetic to

11

an individual who committed a serious crime." Answer at 17:26-18:25.

I agree that the prosecutor's misstatement was harmless and that this explanation for striking Domanique J. was credible. Although a misstatement by a prosecutor "can be another clue showing discriminatory intent," it alone is not dispositive. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2250 (2019). The record indicates that this misstatement amounted to an "innocent transposition of juror information" that did not undermine the prosecutor's credibility or otherwise show purposeful discrimination. *See Aleman*, 723 F.3d at 982.

The prosecutor's concern with Domanique J.'s experience with his aunt (or with his mother, as misstated) was that Domanique J. might sympathize with someone facing time in prison for committing a crime. *See* RT V at 859. The prosecutor noted that Domanique J. had visited his relative while she was incarcerated, which was true. *Id.* Although it was unclear whether, as the prosecutor stated, Domanique J. actually lived with his aunt at the time of her arrest and incarceration—Domanique J. stated only that he was "living there at the time," without elaborating where "there" was—this detail is not dispositive. *See id.*; *see also* ART III at 458. The point is that Domanique J. described a close relationship with a relative—be it his mother or his aunt—who had been convicted and incarcerated. It was credible, then, for the prosecutor to strike him based on a race-neutral reason: that he "might be prone to sympathy at the prospect of somebody going to prison for a crime." RT V at 859. The basis of the strike was the risk of sympathy arising from the close familial relationship, which remains intact regardless of the specific relative involved.

These facts are also distinguishable from the cases that Bennett cites, where courts found that a prosecutor's mischaracterizations were substantial evidence of purposeful discrimination. These cases demonstrate how the "prosecutor's credibility is undermined when he or she offers an explanation for a peremptory challenge that mischaracterizes a juror's testimony in a manner *completely contrary* to the juror's stated beliefs." *Aleman*, 723 F.3d at 982 (emphasis added).

In *Cook v. LaMarque*, 593 F.3d 810, 818 (9th Cir. 2010), the court found that a prosecutor's statement that he was "concerned that [the juror] did not believe police witnesses were always truthful" was "evidence of discriminatory pretext" because it ignored the juror's full

12

statement: "I don't believe police officers are always truthful, but I don't believe the civilian would be either." This mischaracterization of the juror's testimony did not conflate relationships, but asserted a sentiment that the juror did not express.

In *Castellanos*, the prosecutor stated that he struck a juror because she did not have any children when in fact she had testified as having two children. 766 F.3d at 1148. This factual error—whether a person is a parent—was more significant than a minor misstatement regarding a juror's familial relationship. *See Jamerson,* 713 F.3d at 1232 n.7 (finding that there was no proof of discriminatory intent when a prosecutor misstated that a juror had brothers, rather than a single brother, in prison). Again, the issue was not whether Domanique J.'s mother or aunt was incarcerated, rather, it was that he was close to a relative who was.

Lastly, Bennett analogizes to *Miller-El v. Dretke*, 545 U.S. 231, 243 (2005), where the prosecutor stated that he struck a juror because of the juror's comment that he "could only give death if he thought a person could not be rehabilitated." The Supreme Court determined that the prosecutor mischaracterized the juror's testimony by representing that he "said he would not vote for death if rehabilitation was possible" when in fact the juror "unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation." *Id.* at 243-44. Here again is a situation where the prosecutor substantively mischaracterized a juror's sentiment rather than confused identities.

Unlike these cases, the prosecutor's misstatement about Domanique J. did not mischaracterize his testimony in a completely contrary way. The concern was that because Domanique J. had a close relationship with a relative who had been convicted of a crime and incarcerated, he might be "prone to sympathy at the prospect of somebody going to prison for a crime." RT V at 859. Whether that relative was Domanique J.'s mother or aunt does not change the basis for the strike. Accordingly, the misstatement did not demonstrate discriminatory intent.

**B. The Statement Regarding Domanique J.'s Beliefs About the Justice System**

Bennett argues that the prosecutor's additional explanation for striking Domanique J.— because he "question[ed] whether the criminal justice system works for the most part"—was another non-credible misstatement that should be considered pretext for discrimination. *See* Pet.

13

at 19:3-14; *see also* RT V at 859.

The juror questionnaire asked potential jurors about their "general feelings about the fairness and effectiveness of the criminal justice system." SCT III at 726. Domanique J. wrote: "The criminal justice system works for the most part but there are cases where I feel the system has not worked." *Id*. In explaining his rationale for striking Domanique J., the prosecutor said that he also did so because Domanique J. "question[ed] whether the criminal justice system works for the most part." RT V at 859. In accepting this answer, the trial court stated that Domanique J. considered the criminal justice system "inherently unfair." *Id*. at 871.

A prosecutor's mischaracterization signals purposeful discrimination when it changes the basis for the strike. *See Jamerson*, 713 F.3d at 1232 n.7. While the prosecutor's assertion may have been an overstatement, it was not, as Bennett asserts, the "exact opposite" of what Domanique J. stated in his questionnaire. *See* Pet. at 19:11. Nor did it change the basis for the strike. Domanique J.'s statement was somewhat equivocal; he did not definitively say that the system worked or did not. Rather, he provided a caveat: that there were certain cases where it did not. Based on that caveat, the prosecutor's summation of Domanique J.'s views, although not entirely accurate, did not completely misrepresent or change his sentiment. Domanique J. did question whether the system worked, as evidenced by the cases that he obliquely referenced. Again, any misstatement by the prosecutor did not signal discriminatory intent.[3]

### C. The Statements of Other Jurors

Bennett further argues that the prosecutor's justifications for dismissing Domanique J. are not valid because he failed to dismiss similarly situated jurors who were not Black. *See id*. at 19:15-20:15 (citing jurors' statements about the criminal justice system); 20:16-21:9 (citing jurors'

---

[3] Bennett also argues that by misconstruing Domanique J.'s statements, the prosecutor "shoe-horned his testimony into categories that appear race-neutral but are in fact based on group bias" against people who are black. Pet. at 21:12-17. Bennett contends that the prosecutor assumed, because Domanique J. is black, "that he did not trust the criminal justice system" and "that he knew people who had been affected by the criminal justice [system] and therefore would be sympathetic to criminal defendants." *Id*. at 21:24-22:1. I recognize the gravity and dangers of the type of bias described by Bennett, whether explicit or implicit. But the evidence supports the prosecutor's individualized reasons for dismissing Domanique J., including his close relationship with his aunt and the risk of sympathy that came with it, and his specific feelings about the justice system.

14

statements about their connections to people in prison). The court may use comparative juror analysis to determine whether the prosecutor's reason for striking a juror was pretextual and instead constituted purposeful discrimination. *See Snyder v. Louisiana*, 552 U.S. 472, 484-85 (2008). This is a side-by-side comparison of the challenged juror and non-challenged jurors to see if the proffered reason would also apply to the latter. *See Miller-El*, 545 U.S. at 241.

Bennett contends that the prosecutor's credibility was undermined by a comparison of Domanique J.'s statements about the justice system and four non-Black jurors' statements about the justice system that were "far more critical." Pet. at 19:15-20:15. Bennett describes those statements as:

> Juror No. 1: Stated that the criminal justice system was "imperfect," although it was better than other countries.
>
> Juror No. 5: Stated that the criminal justice system had its shortcomings, such as taking forever. His children were victims of a crime, and the judge "screwed that case up at first but we got it straightened out two years later." The juror nodded in agreement in response to the question "sounds like it was kind of involved and there's issues or problems?"
>
> Juror No. 7: Wrote on his questionnaire that "The system incarcerates large numbers of Latinos and African Americans."
>
> Juror No. 12: Wrote in her questionnaire, "It can work sometimes the innocent are required to pay for an attorney and fall between […] not eligible for a public defender but no $ for attorney (sad)."

*Id*. at 19:26-20:10 (citing SCT I at 6, 96, 171; ART II at 253).

The jurors are distinguishable from Domanique J. Juror No. 1 stated that the criminal justice system was "imperfect." SCT I at 6. However, she also stated that it was "way ahead of most countries in the world" and that she was "grateful for it" after working in another country "with no criminal justice system." *Id*. As the Court of Appeal stated, the overall sentiment of her statement was that she "actually felt positively about the system," not that she was "far more critical of the criminal justice system than Domanique J.," as Bennett asserts. *See* State Appellate Op. at 14 n.7; *see also* Pet. at 19:26-27.

When asked in the juror questionnaire about his general feelings about the fairness and effectiveness of the criminal justice system, Juror No. 5 wrote that "it's all we have—and better

15

than most." SCT I at 66. During voir dire, when asked if he saw any shortcomings of the system, he said only that: "It takes forever." ART II at 255. His most critical statement came when discussing a criminal case in which his daughters were victims. *See id*. at 252-53. Juror 5 said that "[t]he judge screwed that case up at first but we got it straightened out two years later." *Id*. at 253. Again, none of these statements are "far more critical of the criminal justice system" than those made by Domanique J. *See also* Pet. at 19:26-27. If anything, Juror No. 5's statements are similar to Domanique J.'s, in that both acknowledged flaws with the system but generally believed that it worked—or, in Juror No. 5's words, was "better than most." *See* SCT I at 66.

Juror No. 7 indicated on his questionnaire that he thought "the system incarcerates large numbers of Latinos and African Americans." SCT I at 96. This may be read as critical of the criminal justice system, but it does not directly speak to whether the system "works for the most part," as Domanique J. asserted.

Juror No. 12 both questioned the criminal justice system and had a brother who was incarcerated at Santa Rita Jail, which Bennett also argues was pretextual because "several" non-Black jurors who worked or visited people in prison and were not challenged. Pet. at 20:19-27; *see also* SCT I at 172. As for her critique of the criminal justice system, Juror No. 12 wrote in her questionnaire that the system "can work sometimes the innocent are required to pay for an attorney and . . . not eligible for a public defender but no $ for attorney (sad)." SCT I at 171. This statement, while somewhat unclear, seems to identify only the specific situation where an innocent person has to pay for their own defense. This is not akin to Domanique J.'s general statements about the legal system.

Bennett's argument regarding other jurors who had interactions with people who were incarcerated fares no better. Unlike Domanique J., most of the allegedly similar jurors (including Jurors Nos. 1, 5 and 7, discussed above) did not have a close relative who had been incarcerated. Instead, he points to: Juror No. 3, who once visited a person in prison; Juror No. 9, who worked as a counselor in prison; and Juror No. 12, who posted bail and picked up her brother from jail. *See* Pet. at 20:25-28.

Juror No. 3 stated that he visited "an inmate at Vacaville prison" approximately 30 years

16

1  ago. SCT I at 37. As the Court of Appeal noted, "[t]he individual apparently was not a relative or
2  close friend"—neither the questionnaire nor voir dire reveals that person's relationship to Juror
3  No. 3. *See* State Appellate Op. at 20; *see also* SCT I at 37; ART II at 377-82. This stands in stark
4  contrast to Domanique J., who visited his aunt in jail three times over four to five years until she
5  was released the same year as Bennett's trial. *See* ART III at 458. Juror No. 9 worked as a
6  counselor in a juvenile correctional facility for six months while in graduate school a few years
7  prior. *See* ART III at 491-92; SCT I at 122, 127. This is not the same kind of personal, familial
8  contact with the system that Domanique J. had. And Juror No. 12 stated that she once posted bail
9  for her brother and picked him up at the Santa Rita Jail after he had been arrested (not at San
10 Quentin, as Bennett asserts). ART II at 226-28; SCT I at 172; *see also* Pet. at 20:26-27. But the
11 brother was not prosecuted, nor sent to prison, and the arrest occurred 10 to 12 years before. ART
12 II at 226-27. A relative's brief contact with the justice system does not reflect the same depth as
13 Domanique J.'s experience. In contrast, Domanique J.'s aunt went to jail for multiple years. He
14 was close to her, visited her multiple times while incarcerated, and she had only recently been
15 released.
16       In short, the record shows that the prosecutor's justifications for dismissing Domanique J.
17 were credible and did not indicate purposeful discrimination based on his race.

### D. The Trial Court's Sua Sponte Justification

19       Finally, Bennett argues that the trial court improperly relied on another reason for striking
20 Domanique J.: because he "had a contact with the criminal justice system, and that he had a
21 negative experience with that," specifically that "[h]e felt he was not treated fairly." Pet. at 23:4-7
22 (citing RT V at 874). He contends that not only was it improper for the court to proffer its own
23 reason supporting the prosecutor's challenge, but that the trial court also misstated the record in
24 doing so. *Id*. at 23:7-20.
25       Bennett is correct that this statement is not accurate. When asked if he was treated fairly
26 following his arrest, Domanique J. stated: "I was definitely. At the time, like the arrest, I guess
27 you would say I didn't feel like I was treated fairly, but I definitely got off very easy." ART III at
28 457-58. But the court's comment—although inaccurate—does not automatically render its

17

consideration of the prosecutor's credibility unreasonable. A sua sponte explanation of strikes offered by the court is not sufficient to rebut discriminatory purpose. *See Paulino*, 371 F.3d at 1089-90. This is because "it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the real reason they were stricken." *Id.* at 1090.

It is clear from the record that, rather than rely on its own reason for striking Domanique J., the trial court considered the reasons proffered by the prosecutor for doing so. The judge noted that "caselaw has repeatedly held that negative experience by the juror or a close relative of the juror, that is a bona fide and genuine and race neutral reason to excuse the juror." RT V at 873-74. The judge then listed 11 case citations supporting this proposition. *Id.* at 871. Additionally, the judge stated that "[t]he fact that a juror is skeptical about the fairness of the criminal justice system had been repeatedly held . . . as a race neutral justification to excuse the juror." *Id.* Both of these statements indicate that the trial judge accepted the prosecutor's two proffered reasons for striking Domanique J., rather than relying solely on his own *sua sponte* justification. Even if the court did err in proffering its own reason for striking Domanique J., any such error was harmless because that was not the sole reason that the court found the prosecutor credible.

In sum, a de novo review shows that the prosecutor's reasons for striking Domanique J. were credible and not based upon race, meaning there was no violation of the Equal Protection Clause. Bennett is not entitled to habeas relief.

### III. DEFERENTIAL REVIEW

"Courts can . . . deny writs of habeas corpus under section 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). Obviously, in light of the reasoning in the last section, a deferential review of the appellate court's decision shows that Bennett is not entitled to relief.

For a deferential review, "[t]he pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous." *Sifuentes*, 825 F.3d at 518. "Rather, the pertinent question is whether the state appellate court was objectively unreasonable in upholding the trial court's determination." *Id*. Even if I had "reached

18

a different conclusion regarding the prosecutor's credibility" (which I did not), I "must give the state appellate court the benefit of the doubt, and may not grant the habeas petition unless the state court's decision was not merely wrong, but actually unreasonable." *Id*. (citations omitted).

The Court of Appeal was not objectively unreasonable in upholding the trial court's determination that no *Batson* error occurred. The appellate court's decision laid out the relevant facts in detail, including the prosecutor's misstatements about Domanique J.'s mother and his characterization of the criminal justice system, and the trial court's consideration of the prosecutor's credibility. *See* State Appellate Op. at 17-21. It also considered Bennett's comparison of Domanique J. to other jurors. *See id*. at 20-21. Taking this into account, the appellate court determined that the trial court "considered at length the prosecutor's reasons for challenging each of the three prospective jurors discussed above, concluded that all of the proffered reasons were valid and race-neutral, and expressly found the prosecutor credible and his justifications genuine." *Id*. at 21. "We see no *Batson/Wheeler* error on this record," the court wrote, "and certainly no abuse of discretion." *Id*. There is nothing that indicates to me that this conclusion was in error, let alone unreasonable.

The Court of Appeal also considered Bennett's argument that the trial court applied an improper legal standard and that de novo review was thus warranted. *Id*. at 11 n.6. Relying on California Supreme Court cases, it noted that "the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider." *See id*. (citing cases). The appellate court concluded that this was "exactly what the trial court did here," and concluded, "[a]mong many other factors . . . that the retention of one Black juror and one Black alternate supported a finding that the prosecutor's race-neutral reasons for his peremptory challenges were credible." *Id*. Even if the trial court *did* err by "improperly inflat[ing] the importance of this factor by finding it 'powerful evidence' of the prosecutor's lack of discriminatory intent," the appellate court wrote that it would "reach the same result under a de novo standard of review." *Id*.

Even if the retention of the Black juror and alternate was more appropriately considered at the first step of the *Batson* inquiry rather than the third, as Bennett argues in support of de novo

19

review, the appellate court clearly determined that the trial court considered the prosecutor's many individual reasons for striking Domanique J., as required at the third and final step. I see nothing objectively unreasonable about the appellate court's determination.

## CONCLUSION

Bennett's petition is DENIED.

**IT IS SO ORDERED.**

Dated: August 9, 2023

William H. Orrick
United States District Judge